**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMARCUS FENNELL** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  19-4183** |
| | : | |
| **CHARLES HORVATH,** *et al.* | : | |

## MEMORANDUM

**KEARNEY, J.**                                                            **May 20, 2020**

Jamarcus Fennell claims several correctional officers violated his constitutional rights and retaliated against him for his exercise of constitutional rights during an eleven-month stay in the Northampton County Prison awaiting his criminal trial.  He alleged a litany of grievances at different times against different state actors: Investigator Charles Horvath violated his Fifth and Sixth Amendment rights during an August 2018 interview; Correctional Officer John Colarusso violated his Eighth and Fourteenth Amendments rights through abuse for over three-months beginning in August 2018;  Lieutenant Luis Alberto Cruz violated his Eighth and Fourteenth Amendment rights by directing he be strip searched on December 6, 2018; Lieutenant Chad Rinker, Prison Correctional Officers Charles Crowley, Stephen Thorman and Brad Nicholas, and former Correctional Officer Tyler Waterman acted with excessive and unreasonable force violating the Eighth and Fourteenth Amendments by placing a spit hood on him on February 15, 2019.  He also claims each state actor retaliated against him for engaging in constitutionally protected activity.

After Mr. Fennell's appointed counsel prudently narrowed his claims following discovery and following oral argument, we partially grant summary judgment dismissing Investigator Horvath and Lieutenant Cruz.  We find genuine issues of material fact for trial as to Mr. Fennell's excessive force and retaliation claims against Officer Colarusso, his excessive force claim against

Officer Thorman, and as to his retaliation claims against Lieutenant Rinker and former Officer Waterman.[1]  We dismiss the remaining claims.

## I.      Undisputed material facts adduced in discovery[2]

Jamarcus Fennell entered Northampton County Prison on July 27, 2018 awaiting trial on charges of drug delivery and criminal use of a communication facility.[3]  He plead guilty to criminal use of a communication facility almost eleven months later in June 2019 and accepted a sentence of time served.[4]  Following his release and through appointed counsel, he sued several prison officials for separate incidents during his pretrial detention in their individual capacity.[5]

### *Investigator Horvath.*

Investigator Horvath is the Prison's "professional responsibility investigator," meaning he is charged with the "criminal investigations of inmates."[6]  Investigator Horvath is authorized to "file [] criminal charges against" Prison inmates.[7]  Investigator Horvath has served in this role for approximately three years.[8]

In early-August 2018, Investigator Horvath began listening to Mr. Fennell's telephone calls.[9]  He heard Mr. Fennell reference selling commissary to another inmate, John Hofer,[10] which involved Mr. Hofer's mother paying $100 to Mr. Fennell's girlfriend.[11]  Investigator Horvath did not note he believed this to be a drug transaction.[12]  But Investigator Horvath noted hearing Mr. Fennell ask his girlfriend to Facebook message a man named Scott Dittmar.[13]  Investigator Horvath understood Scott Dittmar to be a gang member involved with the introduction of contraband into the jail and involved in the local drug culture.[14]

On August 13, 2018, Investigator Horvath interviewed Messrs. Hofer and Fennell about the information he heard listening to Mr. Fennell's telephone calls.[15]  He interviewed Mr. Hofer first.[16]  During this interview, Investigator Horvath swears Mr. Hofer admitted to the commissary

sale.[17]  Mr. Hofer explained he "owed [Mr. Fennell] 100 bucks for $75 worth of commissary" and his "mom took care of it" for him by paying Mr. Fennell's girlfriend.[18]

Investigator Horvath then summoned Mr. Fennell to the interview room.[19]   Mr. Fennell sat closest to the door of the interview room.[20]   Mr. Fennell was not in handcuffs during the interview.[21]   The Prison uses this interview room for many purposes.[22]

Investigator Horvath asked Mr. Fennell whether he sold commissary to Mr. Hofer.[23] Investigator Horvath's notes indicate Mr. Fennell admitted to the sale.[24]  Investigator Horvath then asked Mr. Fennell about his dealings with Mr. Dittmar, wanting to know whether Mr. Fennell "might also be involved in the things that Mr. Dittmar was involved with"—including "the introduction of illegal contraband, meaning drugs, into the jail."[25]  Mr. Fennell then "became irate and started yelling about contacting his lawyer" because Investigator Horvath did not read him his Miranda rights before beginning this line of questioning.[26]   Investigator Horvath explained to Mr. Fennell he believed he did not need to read Mr. Fennell his Miranda rights because he was not conducting a criminal investigation but rather just an internal prison investigation.[27]

The exchange escalated when Mr. Fennell believed he heard Investigator Horvath use a racial slur.[28]  According to Investigator Horvath's notes: "As I was explaining to [Mr.] Fennel [*sic*] again why I did not have to read him his rights, he abruptly cut me off and shouted, 'What? What's that? Did I just hear you call me a nigger?'"[29]  Investigator Horvath denied Mr. Fennell's charge.[30]

Mr. Fennell swears to his account of the August 13, 2018 interview after he requested to speak to his lawyer.  He swears Investigator Horvath told him he had no rights and had to answer his questions.[31]   After this, Investigator Horvath stood up and blocked the door of the room, preventing him from leaving.[32]   Mr. Fennell swears Investigator Horvath "then mumbled something that sounded like the word 'nigger,'" so he "asked if [Investigator Horvath] just called

him a nigger."[33]   Investigator Horvath said "no," and Mr. Fennell said "it sure sounded like it."[34]

Investigator Horvath told him he was not allowed to leave the room until he finished answering

all of his questions.[35]   Investigator Horvath told Mr. Fennell he would impose discipline if he did

not answer the questions; Mr. Fennell swears he felt pressured to answer Investigator Horvath's

questions.[36]   Investigator Horvath only permitted Mr. Fennell to leave the room to seek medical

assistance after "experiencing physical symptoms of anxiety."[37]

After the meeting, Investigator Horvath filed a formal misconduct against Mr. Fennell for

"Operation of an Unauthorized Business [selling commissary], Disrespect to Staff [accusing

Investigator Horvath of using the racial slur], Unauthorized Use of Telephone [organizing

commissary sale by phone], Lying to an Employee [relating to the racial slur], and Use of Obscene

Language [relating to the racial slur]."[38]   A different Prison official upheld these misconduct

citations[39] and determined Mr. Fennell's punishment for the misconducts.[40]

Investigator Horvath did not charge Mr. Fennell with criminal charges after the August 13,

2018 interview.[41]   Investigator Horvath did not testify at Mr. Fennell's criminal trial for the then-

pending drug charge.[42]   Neither Mr. Hofer nor Mr. Dittmar were Mr. Fennell's co-defendant in his

criminal trial, and Mr. Fennell does not adduce evidence to suggest Investigator Horvath

specifically sought to investigate Mr. Fennell's drug charge.[43]   Mr. Fennell admits nothing he said

during his interview with Investigator Horvath was used as evidence during his trial for the charges

pending against him on August 13, 2018.[44]   Investigator Horvath's questioning did not result in

new criminal charges against Mr. Fennell.[45]

### Officer Colarusso's conduct in late August 2018 through October 2018.[46]

Mr. Fennell swears Officer Colarusso began abusing him ten days after the Investigator

Horvath interview.  In late August 2018, Mr. Fennell swears Officer Colarusso forced him to move

from top tier to bottom tier and into Aaron Wiggins' cell, with whom Mr. Fennell did not have a good relationship;[47] Officer Colarusso then told Mr. Fennell: "I'll kill your family";[48] and, he then attempted to shut Mr. Fennell's cell's water main off.[49]  Mr. Fennell swears he then told Officer Colarusso he needed to urinate; Officer Colarusso responded "go ahead, I'll watch."[50] Officer Colarusso then attempted to watch Mr. Fennell expose himself to urinate.[51] Mr. Fennell refused and screamed for lieutenants.[52]  Officer Colarusso then threatened Mr. Fennell, telling Mr. Fennell's cellmate to cover his face while he "fucking sprays Fennell."[53] Mr. Fennell swears Officer Colarusso then shot a mace gun into Mr. Fennell's cell but missed Mr. Fennell.[54]

Mr. Fennell claims Officer Colarusso then began retaliating against him after he complained about Officer Colarusso to Lieutenant Chewblowski.  Lieutenant Chewblowski moved Mr. Fennell back upstairs.[55]  During the following week, Officer Colarusso called Mr. Fennell a "snitch."[56]  Mr. Fennell swears Officer Colarusso called him a "snitch" to solicit other inmates to assault Mr. Fennell in retaliation for Mr. Fennell's complaints to Lieutenant Chewblowski.[57]  Mr. Fennell swears Officer Colarusso called Mr. Fennell a "snitch" in front of the unit 174 times over the course of ten days.[58] Officer Colarusso encouraged inmates to yell out "snitch."[59]

Mr. Fennell wrote his girlfriend's phone number on a piece of paper to have an elderly gentleman call her and report Officer Colarusso's alleged abuse and retaliation.[60]  Officer Colarusso had a runner come upstairs, take the paper, call Mr. Fennell's girlfriend, and harass her in front of Mr. Fennell.[61]  Officer Colarusso then hung up a piece of paper with the phone number on it that read "free whore" over top of the number.[62]

Mr. Fennell reported this incident to Lieutenant Rinker.[63]  Lieutenant Rinker told Mr. Fennell to write a letter of occurrence and send him this form of grievance, which he did on September 4, 2018.[64]  From September 5 through September 8, 2018, Officer Colarusso called Mr.

Fennell a "snitch" and other derogatory phrases and also threatened him.[65]  Officer Colarusso told inmates he would pay them to "put hands and feet" on Mr. Fennell.[66]

Mr. Fennell swears Officer Colarusso's allegedly abusive and retaliatory conduct caused him extreme anxiety to point of being placed in suicide prevention.[67]  On October 17, 2018, Officer Colarusso called Mr. Fennell a "snitch" and threatened Mr. Fennell with assaults and solicited attacks.[68]  The next day, Officer Colarusso loudly told another inmate Mr. Fennell was his favorite "bitch" and his personal "court reporter."[69]  A week later, Officer Colarusso denied Mr. Fennell a grievance and a shower after a 74-hour lock down.[70]  Officer Colarusso threatened Mr. Fennell with more retaliatory misconducts if he continued to request a lieutenant.[71]

### Mr. Fennell sues Prison officers in November 2018.

On November 9, 2018, Mr. Fennell sued Investigator Horvath, Officer Colarusso, Lieutenants Rinker, Chewblowski, and Ashley Warning, Captain Jason Werley, Examiner John Harman, Warden David Penchishen, and Captain David Collins.[72]  He sued Investigator Horvath and Officer Colarusso for the same incidents described above.[73]  He named the other Defendants because they declined his grievances against Investigator Horvath and Officer Colarusso.[74]

Mr. Fennell believes Prison employees are generally familiar with civil lawsuits and retaliate against him for this lawsuit.[75]  Mr. Fennell claims his lawsuits were "common knowledge."[76]  At some point in December, a Prison official circulated an email updating staff on Mr. Fennell's lawsuit.[77]

### Lieutenant Cruz's December 6, 2018 conduct.

On December 6, 2018, Mr. Fennell had to leave his housing unit, J-Tier, to attend his formal criminal arraignment.[78]  To appear at the arraignment, Mr. Fennell needed to walk through H-Tier.[79]  The Prison stationed Officer Santiago on J-Tier and Officer Gazzano and Lieutenant

Heinrich on H-Tier.[80]  When Mr. Fennell left J-Tier the first time, he wore his jumper inside out.[81] Officer Gazzano and Lieutenant Henrich told him to return to J-Tier to fix his jumper.[82]  Mr. Fennell returned to J-Tier, fixed his jumper, but then rolled the pants legs up before returning to H-Tier.[83]  Officer Gazzano and Lieutenant Henrich then told him to unroll his pant legs, which he did.[84]

Officer Santiago issued Mr. Fennell a formal misconduct for failing to properly wear his uniform.[85]  The proper way for an inmate to wear a jumper is right side out, buttons facing forward and buttoned, and pants legs rolled down.[86]   A formal misconduct is a major offense; major offenses require an offender be transferred to disciplinary segregation.[87]

Lieutenant Cruz approved the formal misconduct.[88]  Lieutenant Cruz did not direct Officer Santiago to write the misconduct.[89]  Lieutenant Cruz did not add additional misconduct citations to Officer Santiago's misconduct report.[90]  Lieutenant Cruz did not determine the punishment for the misconduct.[91]  Lieutenant Cruz did not determine Mr. Fennell's guilt for the misconduct.[92]

After this formal misconduct cite, Prison officials placed Mr. Fennell on suicide watch.[93] Lieutenant Cruz did not decide to place Mr. Fennell on suicide watch.[94]

Prison officials performed a strip search on Mr. Fennell consistent with Prison policy.[95] Mr. Fennell refused to follow the command to lift his scrotum during the strip search in Lieutenant Cruz's presence.[96]  Officials repeatedly commanded Mr. Fennell to lift his scrotum.[97]  Lieutenant Cruz and the other officers present had never experienced an inmate refuse to lift his scrotum during a strip search.[98]  To complete the strip search, Lieutenant Cruz directed a nurse to lift Mr. Fennell's scrotum to ensure Mr. Fennell did not conceal anything on his body.[99] Mr. Fennell's refusal made him a non-moving resister.[100]  Lieutenant Cruz supplemented Mr. Fennell's earlier formal misconduct citation by writing "refused orders during body search."[101]

Lieutenant Cruz swears he was not aware of Mr. Fennell's lawsuit on December 6, 2018.[102] Mr. Fennell denies Lieutenant Cruz swears to the truth. He asserts Lieutenant Cruz orchestrated the December 6, 2018 formal misconduct to punish him for filing the November 8, 2018 lawsuit.[103]

### *Mr. Fennell files a January 8, 2019 lawsuit.*

On January 8, 2019, Mr. Fennell sued numerous Prison officials, including Lieutenants Cruz and Rinker for violating his Equal Protection rights.[104] Mr. Fennell's claims related to an incident where Prison officials did not return $89.00 worth of soups and chips Mr. Fennell purchased from the Prison commissary store.[105] Defendants' counsel entered his appearance on February 13, 2019.[106]

### *Lieutenant Rinker, Officer Thorman,*
### *and former Officer Waterman's conduct in February 2019.*

Officer Waterman is a former Prison correctional officer who worked in J-Tier in February 2019.[107] Officer Waterman and Mr. Fennell had negative encounters "almost on a consistent basis[.]"[108] On February 8, 2019, Officer Waterman completed an incident report stating Mr. Fennell threatened to sue him.[109] Officer Waterman filed another incident report on February 14, 2019 stating Mr. Fennell threatened to lie about him to get him in trouble.[110] Officer Waterman discussed these incidents with Lieutenant Rinker.[111]

On February 15, 2019, Officer Waterman told Lieutenant Rinker he received certain threats from Mr. Fennell.[112] Officer Waterman swears Mr. Fennell told him he and other inmates were going to refuse to lock-in after recreation and Officer Waterman would need to call the whole community emergency response team to resolve their refusal.[113] Officer Waterman heard Mr. Fennell tell him: "Don't worry I've got something for you."[114] Officer Waterman took Mr. Fennell's statements as serious threats.[115] Mr. Fennell denies making these statements.[116]

After Officer Waterman spoke to Lieutenant Rinker about his issues with Mr. Fennell, the

officers issued Mr. Fennell a misconduct.[117]   Lieutenant Rinker and Officers Thorman, Crowley,

and Nicholas responded to the J-Tier.[118]   They considered their response to be an emergency.[119]

They were concerned about the safety of Officer Waterman.[120]   The officers concern extended to

the safety of other inmates on J-Tier.[121]

The officers then removed Mr. Fennell from his cell.   Officers gave Mr. Fennell multiple

commands to place his hands behind his back and walk backwards toward the gate.[122]   Mr. Fennell

did not obey these commands.[123]   Officers Thorman and Crowley entered his cell.[124]   Mr. Fennell

did not turn around to permit them to handcuff him.[125]   Officers Thorman and Crowley used holds

to place handcuffs on Mr. Fennell.[126]   Mr. Fennell refused to walk out of his cell on his own.[127]

Officers carried Mr. Fennell to medical.[128]   At medical, staff placed Mr. Fennell in the recovery

position so they could evaluate him.[129]   Medical staff attempted to evaluate Mr. Fennell.[130]

Medical placed Mr. Fennell on suicide watch.[131]   None of the medical personnel required Mr.

Fennell to remain in medical for treatment.[132]   Medical did not diagnose Mr. Fennell with

injuries.[133]

Officer Thorman then placed a spit hood on Mr. Fennell.[134]   The Prison officers do not

adduce evidence of a Prison policy instructing officers when to apply a spit hood.[135]   Officer

Thorman never trained himself on using a spit hood nor did he read the instructions.[136]   The

instructions caution users may suffer serious injury or death could if used improperly.[137]   Officer

Thorman testified he "would like to have the spit hood on [an inmate]" when he has "to get physical

with [the] inmate."[138]   Mr. Fennell swears he could "hardly breathe" with the spit hood over his

face.[139]

The officers ordered Mr. Fennell to walk of his own accord to H-Tier.[140]   Once Officer

Thorman placed Mr. Fennell in a cell on H-Tier, officers removed his clothing using a cutting tool

to conduct a strip search.[141]   Medical personnel evaluated Mr. Fennell in his cell on H-Tier.[142] Medical personnel did not require Mr. Fennell to return for treatment nor did they diagnose Mr. Fennell with any injury.[143]

## II.   Analysis[144]

Each of the correctional officers move for summary judgment arguing there are no disputes as to a material fact and they are entitled to judgment as a matter of law.   Mr. Fennell opposes summary judgment arguing he adduces sufficient factual matter allowing a reasonable jury to find in his favor on his remaining claims.

### A.   We enter judgment in favor of Investigator Horvath.

Mr. Fennell sues Investigator Horvath for violations of his Fifth and Sixth Amendment rights and for unlawful retaliation. Investigator Horvath moves for summary judgment as to each of these three claims.   We find no genuine issues of material fact and judgment as a matter of law must be entered in favor of Investigator Horvath.

#### 1.   Mr. Fennell did not adduce facts supporting a Fifth Amendment claim against Inspector Horvath.

Investigator Horvath argues Mr. Fennell fails to adduce facts showing Investigator Horvath violated his Fifth Amendment rights during the August 13, 2018 interview.   Investigator Horvath specifically argues: (1) the Fifth Amendment protections do not extend to prison misconducts; (2) Investigator Horvath did not place Mr. Fennell in a custodial setting; and, (3) failure to read Miranda rights is not a cognizable constitutional claim capable of asserting under Section 1983. Mr. Fennell responds Investigator Horvath incorrectly posits (1) Investigator Horvath was not investigating a potential crime even though he asked Mr. Fennell about drug activity; and (2) this was not a custodial setting.   But Mr. Fennell does not address whether he has a cognizable Section 1983 claim under the Fifth Amendment.

The self-incrimination clause of the Fifth Amendment provides: "[n]o person ... shall be compelled in any criminal case to be a witness against himself."[145] In *Miranda v. Arizona*,[146] the Supreme Court implemented a prophylactic measure of criminal procedure designed to protect against violations of the self-incrimination clause. Under this protection, referred to as a "Miranda warning," the government is required to advise an individual of his or her rights before beginning a custodial interrogation.[147] But violations of *Miranda*'s prophylactic measures "do not amount to violations of the Constitution itself."[148] A constitutional violation only occurs when a Miranda violation compels an individual to be a witness against himself in a criminal prosecution.[149] Conducting a custodial interrogation without Miranda warnings "is not a basis for a § 1983 claim as long as the plaintiff's statements are not used against her at trial."[150] There is no free-standing Fifth Amendment right to counsel during an interrogation because the right to counsel recognized in *Miranda* "is merely a procedural safeguard, and not a substantive right."[151]

Investigator Horvath does not attempt to adduce facts showing he read Mr. Fennell his Miranda rights. And Mr. Fennell adduces sufficient facts showing he may have been subject to custodial interrogation. But Mr. Fennell fails to adduce evidence Investigator Horvath revealed any of his statements made during the August 13, 2018 interview were used against him at trial.[152] Without adducing this evidence, Mr. Fennell has no actionable Fifth Amendment claim under Section 1983.

###    2.    Mr. Fennell did not adduce facts supporting a Sixth Amendment claim against Inspector Horvath.

Investigator Horvath moves for summary judgment on Mr. Fennell's Sixth Amendment claim, arguing this right to counsel only applies to pending charges and Investigator Horvath did not question Mr. Fennell about his pending charges or investigations. Mr. Fennell argues he adduces sufficient facts to allow a jury to reasonably conclude Investigator Horvath questioned

Mr. Fennell about his pending charges. We disagree.

Under the Sixth Amendment, "[i]n all prosecutions, the accused shall enjoy the right... to have the Assistance of Counsel for his defence."[153]  The right does not attach, generally, until criminal proceedings have been initiated against the defendant.[154]  Criminal proceedings include the "formal charge, preliminary hearing, indictment, information, or arraignment."[155]  The Sixth Amendment right to counsel is "offense specific" with no exception for "factually related" or "inextricably intertwined" crimes.[156]

Mr. Fennell adduces evidence of his interview with Investigator Horvath.  He adduces evidence Investigator Horvath questioned him about the sale of commissary and involvement with Mr. Dittmar.  Mr. Fennell reasons because Investigator Horvath asked Mr. Fennell about involvement with Mr. Dittmar, a known drug dealer possibly involved in introducing contraband into the Prison, a jury could reasonably conclude Investigator Horvath questioned Mr. Fennell about his criminal charges.  We are not persuaded by this leap of inferences.  Investigator Horvath adduces evidence he questioned Mr. Fennell about his involvement with Mr. Dittmar because of evidence showing Mr. Fennell, while housed at the Prison, requested his girlfriend Facebook message Mr. Dittmar.  Investigator Horvath wondered why Mr. Fennell would make this request and, as a part of his job to investigate jail misconduct, asked Mr. Fennell.  Mr. Fennell fails to connect this inquiry to Mr. Fennell's pending drug charges.

Our review is offense specific.  We see no evidence Investigator Horvath questioned Mr. Fennell about his pending drug charges.  Mr. Fennell does not adduce evidence showing Mr. Dittmar's involvement in his drug charges or his charges involved selling contraband into the Prison. On the present record, there is no connection between the line of questioning about Mr. Dittmar and Mr. Fennell's criminal charges. The only common factor is Mr. Fennell's involvement

in a drug charge and Mr. Dittmer is reputed to be a drug dealer.  Mr. Fennell adduces no evidence Mr. Dittmar had anything to do with Mr. Fennell's drug offenses leading to pretrial detention.

Mr. Fennell attempts to defeat summary judgment by arguing the commonality of drugs with Mr. Dittmar and citing to the Supreme Court's 1964 decision in *Escobedo v. Illinois*.[157]  In *Escobedo*, Cook County police arrested Danny Escobedo hours after his brother-in-law was shot dead.  Mr. Escobedo did not make a statement about the murder while in custody, and police released him after Mr. Escobedo's lawyer filed a state court writ of habeas corpus.  Approximately two weeks later, police received information of Mr. Escobedo's involvement in the murder.  Police then arrested Mr. Escobedo and brought him to the station to interrogate him.  During the interrogation, Mr. Escobedo's lawyer arrived to the station; Mr. Escobedo made several requests to see his lawyer, and his lawyer made many requests to see his client.  Police denied these requests.  Police did not advise Mr. Escobedo of his right to remain silent or of any other right.  They instead urged Mr. Escobedo to make a statement.  Mr. Escobedo eventually made statements incriminating himself.  Prosecutors used Mr. Escobedo's statements at trial, and a jury convicted him of murder.

The Supreme Court held the prosecutor improperly used these custodial statements against Mr. Escobedo at trial even though police interrogated him before a formal indictment.  The Court explained "in the context of this case, that fact should make no difference.  When [Mr. Escobedo] requested, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of an unsolved crime."[158]  By the time of Mr. Escobedo's interrogation, he "had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so. . . . [T]he police told [Mr. Escobedo] they had convincing evidence that he had fired the fatal shots. Without informing him of his

absolute right to remain silent in the face of this accusation, the police urged him to make a statement."[159]

Eight years after *Escobedo*, in *Kirby v. Illinois*, the Supreme Court decided the rule we recite above—the right to counsel does not attach until adversarial proceedings have been initiated.[160]   The Court in *Kirby* did not overrule *Escobedo* but explained *Escobedo*'s application is limited to its facts.  We must consider whether Mr. Fennell adduces facts like *Escobedo* to determine if this argument is viable.  He must adduce facts showing he requested counsel during a particularized investigation into criminal wrongdoing.  While Mr. Fennell adduces facts he requested counsel, he fails to adduce facts Investigator Horvath conducted a particularized investigation.  He does not adduce evidence Investigator Horvath knew of Mr. Fennell's guilt.  He does not adduce facts Investigator Horvath told Mr. Fennell he had convincing evidence of wrongdoing.  The undisputed record reveals Investigator Horvath only asked Mr. Fennell why he asked his girlfriend to Facebook message Scott Dittmar.  This is not evidence of a particularized investigation into criminal wrongdoing. Under Mr. Fennell's theory, any questioning of a pretrial detainee regarding any topic would allow a Sixth Amendment invocation of counsel to preclude further questioning.  We wonder how correctional officers could ask about routine matters not involved with a particularized investigation.   We decline to reach as far as Mr. Fennell asks. Mr. Fennell fails to adduce evidence of a violation of his Sixth Amendment rights as in *Escobedo*.

### 3.    Mr. Fennell did not adduce facts supporting his retaliation claim against Investigator Horvath.

Mr. Fennell claims Investigator Horvath issued him five misconducts in retaliation for Mr. Fennell asserting his Fifth and Sixth Amendment rights. Investigator Horvath argues Mr. Fennell was not engaged in constitutionally protected activity and, even if he was, Investigator Horvath

meets his burden of showing he would have reached the same decision regardless of Mr. Fennell's Fifth or Sixth Amendment claims.  We agree with Investigator Horvath.

To defeat a motion for summary judgment seeking to dismiss his retaliation claim, Mr. Fennell must adduce evidence raising genuine issues of material fact: (1) he engaged in constitutionally protected conduct; (2) he suffered adverse action; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse response.[161]  If Mr. Fennell makes a prima facie showing his constitutionally protected conduct was a motivating factor in the decision to discipline, Investigator Horvath then has the burden of showing the same disciplinary action would have been taken place even in the absence of the protected activity.[162]

Mr. Fennell argues he engaged in constitutionally protected conduct under the Fifth and Sixth Amendments.  We explained above Mr. Fennell fails to adduce facts to support civil claims against Investigator Horvath based on the Fifth or Sixth Amendments.  Mr. Fennell relies on these same failing arguments in his retaliation claim.

Even if Mr. Fennell could establish a prima facie case, Investigator Horvath meets his burden of showing undisputed facts he would have taken the same disciplinary action.  Mr. Fennell alleges Investigator Horvath retaliated by issuing five misconducts.[163]  Two of the misconducts relate to selling commissary to Mr. Hofer.  Investigator Horvath adduces undisputed evidence Mr. Hofer admitted to this sale, and he adduces evidence he heard Mr. Fennell discuss this transaction on the telephone.  The three remaining misconducts relate to when Mr. Fennell accused Investigator Horvath of using a racial slur.  Mr. Fennell admits he accused Investigator Horvath of using the slur.  Investigator Horvath vehemently denied using the slur during the meeting and during his deposition.  As counsel explained during oral argument, an inmate accusing a Prison

employee of using a racial slur may create a dangerous situation for the Prison employee. Investigator Horvath held safety and security interests for issuing the misconducts.

Our Court of Appeals in its 2016 opinion in *Watson v. Rozum* discussed when a prison official is entitled to summary judgment as a matter of law on a same decision defense.[164]   In *Watson*, our Court of Appeals reaffirmed its 2002 decision in *Carter v. McGrady* also evaluated on a summary judgment standard.[165]   *Carter* involved an inmate claiming he was given a misconduct because prison officials resented his functioning as a jailhouse lawyer.[166]   Our Court of Appeals rejected his claim, noting "most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence" and explaining "even if prison officials were motivated by animus to jailhouse lawyers, Carter's offenses, such as receiving stolen property, were so clear and overt that we cannot say that the disciplinary action against Carter was retaliatory."[167]   When presented with evidence of this clear and overt offense, our Court of Appeals could "not say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the 'broad discretion' that we must afford them."[168]   Our Court of Appeals explained we must look to the "quantum of evidence" to determine if there is clear and overt offense.[169]

In *Watson*, our Court of Appeals concluded the prisoner's violation—breaking a radio— "was not so 'clear and overt' a violation that we can conclude that [the plaintiff] would have been written up if he had not also given prison officials 'a hard time.'"[170]   The Court of Appeals looked to evidence that the radio had been the same condition for more than a year and "other inmates had radios with loose or broken antennas, but those were not confiscated and the inmates did not receive a misconduct."[171]   Our Court of Appeals also found persuasive that the issuing official did not issue a misconduct to the inmate until after the inmate threatened to file a grievance.

Mr. Fennell does not adduce facts like *Watson* which convinced our Court of Appeals the prison officials were not entitled to judgment.  Mr. Fennell does not adduce evidence of similar instances where an inmate has not been issued a misconduct for similar conduct.  He does not adduce evidence Investigator Horvath waited to file a misconduct until learning about Mr. Fennell filing a lawsuit or grievance.   We instead see similarities to *Carter*—Mr. Fennell simply argues Investigator Horvath retaliated against him for refusing to answer questions.  But the record does not support Investigator Horvath issued a misconduct because of Mr. Fennell's refusal to answer questions but rather because of Mr. Fennell accusing him of using a racial slur.  There is clear and overt evidence Mr. Fennell accused Investigator Horvath of using the slur, including Mr. Fennell's own admission.  There are undisputed facts forming the basis of clear and overt grounds—beyond any theoretical retaliatory animus— for why Investigator Horvath issued the misconducts.  Evaluating the quantum of evidence adduced after discovery as instructed by our Court of Appeals, we cannot find issues of fact contrary to the reasons for discipline.

Mr. Fennell does not adduce facts disturbing the broad discretion our Court of Appeals directs we must afford to prison officials.  Mr. Fennell fails to adduce evidence Investigator Horvath issued any of the five misconduct citations to retaliate against him.  The undisputed evidence is each misconduct is separately grounded in undisputed fact.  Mr. Fennell's disagreement, absent evidence, does not create a genuine issue of material fact.

### B.    Mr. Fennell may proceed on his excessive force and retaliation claims against Officer Colarusso.

Mr. Fennell sues Officer Colarusso for excessive force and for illegal retaliation. Officer Colarusso concedes there are disputed issues of fact on the excessive force claim which must be resolved by a jury.  Officer Colarusso seeks judgment on Mr. Fennell's retaliation claim arguing he had no definitive knowledge of Mr. Fennell's grievances or prior lawsuits. Mr. Fennell responds

he establishes a prima facie case of retaliation by adducing evidence Officer Colarusso treated him with hostility in retaliation for Mr. Fennell a filing grievance. We agree with Mr. Fennell based on disputed genuine issues of material fact precluding summary disposition.

To sustain a retaliation claim, Mr. Fennell must demonstrate that: (1) he engaged in constitutionally protected conduct; (2) he suffered adverse action; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse response.[172] "Because motivation is almost never subject to proof by direct evidence," Mr. Fennell may "rely on circumstantial evidence to prove a retaliatory motive."[173] "He can satisfy his burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link."[174] "If the prisoner makes a prima facie showing that his constitutionally protected conduct was a motivating factor in the decision to discipline, the defendant then has the burden of showing that the same disciplinary action would have been taken place even in the absence of the protected activity."[175]

Mr. Fennell adduces sufficient facts to proceed to a jury on his retaliation claim against Officer Colarusso. Mr. Fennell adduces facts he engaged in a constitutionally protected activity when he filed a grievance against Officer Colarusso on September 4, 2019. He adduces facts during the week after he filed this grievance, Officer Colarusso took adverse actions against him by repeatedly referring to him as a "snitch." Mr. Fennell's adduced facts support a causal relationship because there is at least a close temporal proximity between the protected conduct and the adverse action. Mr. Fennell also adduces evidence supporting a pattern of antagonism. This is sufficient for a prima facie case. Officer Colarusso does not adduce undisputed facts supporting a same decision defense.[176] Mr. Fennell may proceed to a jury on this claim.

**C.     Mr. Fennell does not adduce evidence of Lieutenant Cruz retaliating against him.**

Mr. Fennell sues Lieutenant Cruz for excessive force and for illegal retaliation.  Mr. Fennell conceded his excessive force claim against Lieutenant Cruz during oral argument.  Mr. Fennell instead argues Lieutenant Cruz retaliated against him for filing a lawsuit in November 2018 during events transpiring on December 6, 2018 after Officer Santiago cited Mr. Fennell for failing to properly wear his uniform.  Lieutenant Cruz moves for summary judgment arguing he did not know of Mr. Fennell's lawsuit or grievances and acted solely to protect the safety interests of the jail.  We agree with Lieutenant Cruz.

As with his retaliation claim against Inspector Horvath above, Mr. Fennell must now adduce facts creating genuine issues for the jury as to whether: (1) he engaged in constitutionally protected conduct; (2) he suffered adverse action; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse response.[177]  "Because motivation is almost never subject to proof by direct evidence," Mr. Fennell may "rely on circumstantial evidence to prove a retaliatory motive."[178]  "He can satisfy his burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link."[179] If Mr. Fennell makes a prima facie showing his constitutionally protected conduct was a motivating factor in the decision to discipline, Lieutenant Cruz then has the burden of showing he would have been taken the same disciplinary action even in the absence of the protected activity.[180]

Mr. Fennell adduces evidence meeting the first two elements.  Mr. Fennell engaged in constitutionally protected conduct when he filed a November 9, 2018 lawsuit.  Mr. Fennell shows he suffered an adverse action on December 6, 2018—he received a misconduct, was transferred to

disciplinary segregation, and submitted to a strip search.  But we fail to see how Mr. Fennell adduces evidence of a causal relationship between the constitutionally protected conduct and the adverse action.

Our Court of Appeals does not specify a threshold number of days to show an unusually suggestive temporal proximity between the protected activity and the retaliatory action.  On one end of the spectrum, our Court of Appeals held an inmate's lawsuit filed in 2009 was "just too remote to suggest a retaliatory motive" for conduct occurring in 2011.[181]  At the other end of the spectrum, an inmate suffering an adverse action within hours or days of protected conduct may rely on timing alone to demonstrate causation.[182]  Mr. Fennell's twenty-seven day period falls between those two.  But we find Judge Pratter's analysis persuasive in *Walker v. Regan* counselling a span of seventeen days between the protected conduct and the adverse action "alone may not be 'unduly suggestive' of causation," but the timing combined with the defendant's "history of acrimony, is sufficient to create an inference of causation."[183]

Unlike *Walker*, Mr. Fennell fails to adduce a history of acrimony between himself and Lieutenant Cruz.  Mr. Fennell did not sue Lieutenant Cruz in his November 2018 lawsuit.  He does not adduce evidence, as he does with Officer Colarusso and former Officer Waterman, of negative encounters over a long period of time with Lieutenant Cruz.  Mr. Fennell only adduces evidence of this December 6, 2018 incident.  But even the December 6 evidence he adduces against Lieutenant Cruz does not infer Lieutenant Cruz acted with a retaliatory motive.

The parties largely agree on what happened on December 6.  Mr. Fennell tried to attend a court proceeding wearing his jumper inside out.  Officers on H-Tier asked Mr. Fennell to return to his housing unit to correct his uniform.  Mr. Fennell then returned with his jumper facing the correct way but with his pant legs rolled up.  Officers asked him to roll his pant legs down.  Officer

Santiago, stationed in J-Tier, then issued Mr. Fennell a misconduct for failing to properly wear his uniform.  Lieutenant Cruz reviewed the evidence and approved Officer Santiago's misconduct. Because the misconduct was considered "major," Prison policy required Mr. Fennell be transferred to disciplinary segregation.  During this transfer, Prison policy required Mr. Fennell be stripped searched.  During this strip search, Mr. Fennell refused to lift his scrotum, which led Lieutenant Cruz to direct a nurse to lift Mr. Fennell's scrotum to complete the search. Lieutenant Cruz documented Mr. Fennell's refusal in the misconduct citation.  Mr. Fennell fails to adduce evidence which would allow a reasonable jury to infer Lieutenant Cruz approved or supplemented the conduct because of a retaliatory motive.  We cannot rely on the timing alone, and we see no history of acrimony.

Even if Mr. Fennell could establish this retaliatory motive, Lieutenant Cruz is entitled to the same decision defense.  Lieutenant Cruz approved Officer Santiago's misconduct for legitimate reasons established in the record.  Mr. Fennell does not dispute he wore his uniform inside out and then with the pant legs rolled up.   Lieutenant Cruz supplemented Mr. Fennell's misconduct because Mr. Fennell refused orders during a strip search which required Lieutenant Cruz to direct a nurse to lift Mr. Fennell's scrotum. Lieutenant Cruz establishes these decisions clearly relate to legitimate penological reasons.  We grant Lieutenant Cruz's motion for summary judgment.

### D.     Mr. Fennell may proceed to a jury for his three remaining claims based on the February 15, 2019 events.

After conceding a number of claims stemming from a February 15, 2019 incident during oral argument, Mr. Fennell maintains his excessive force claim against Officer Thorman and retaliation claims against Lieutenant Rinker and Officer Waterman.  Mr. Fennell adduces facts of excessive force against Officer Thorman and retaliation against Lieutenant Rinker and Officer Waterman sufficient to proceed to a jury on these claims.

21

    **1.**    **Mr. Fennell adduces facts supporting an excessive force claim against Officer Thorman.**

Mr. Fennell argues Officer Thorman treated him with excessive force when he applied a spit hood on Mr. Fennell in February 2019.  Officer Thorman argues his use of a spit hood on Mr. Fennell is not excessive force, especially when it did not cause Mr. Fennell physical harm.  Mr. Fennell responds Officer Thorman unnecessarily placed the spit hood and Mr. Fennell could hardly breath after Officer Thorman placed the spit hood.  Mr. Fennell argues he adduces sufficient facts to proceed to a jury.  We agree.

We analyze Mr. Fennell's pre-trial detainee excessive force claim under the Due Process Clause of the Fourteenth Amendment.[184]  Under the Fourteenth Amendment, a pretrial detainee is protected from the "use of excessive force that amounts to punishment."[185]  When considering an excessive use of force claim, we must consider whether force was applied in a "good-faith effort to maintain or restore discipline, or maliciously and sadistically" to cause harm.[186]  When making this determination, we look to several factors addressed in the Supreme Court's 1992 decision in *Hudson v. McMillan*, including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by prison officials; and (5) any efforts made to temper the severity of a forceful response.[187]  These are referred to as the *Hudson* factors.[188]

As evident by these factors, in assessing the use of force, "the extent of injury suffered by [the] inmate is one factor," but Mr. Fennell can establish an Eighth Amendment excessive force claim even without showing "serious injury."[189]   "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. . . . This is true whether or not significant injury is evident."[190]  Although "the Eighth Amendment

does not protect an inmate against an objectively de minimis use of force, .... de minimis injuries do not necessarily establish de minimis force."[191]  "[T]he degree of injury is relevant for any Eighth Amendment analysis, [but] there is no fixed minimum quantum of injury that a prisoner must prove that he suffered through objective or independent evidence in order to state a claim for wanton and excessive force."[192]  "Although the extent of an injury provides a means of assessing the legitimacy and scope of the force, the focus always remains on the force used (the blows)."[193]

There does not appear to be much judicial analysis of whether the use of spit masks or hoods may constitute excessive force.  Officer Thorman cites authority finding use of a spit mask without physical injury cannot support an excessive force claim.  He points to *Robinson v. Southers*, a Report and Recommendation issued by Judge Carlson last month recommending summary judgment be entered on an excessive force claim where the inmate argued prison officials used excessive force by placing a spit hood on him.[194]  Judge Carlson explained when "there is no evidence that plaintiff suffered any injury as a result of the use of a spit mask[,] there is no genuine Eighth Amendment violation."[195]  Officer Thorman also cites *Royster v. Beard*, where an inmate claimed prison officials violated his Eighth Amendment rights by forcing him to wear a spit hood every time he left his cell over a ten-month period.  Judge Bissoon recommended dismissing this claim explaining the inmate "fail[ed] to allege, or even imply, any deprivation of an identifiable human need, the use of force, or exposure to unsafe conditions, that could be plausibly construed as a violation of the Eighth Amendment's prohibition of cruel and unusual punishment" by the use of the spit hood.[196]

We acknowledge these decisions are fact-sensitive requiring us to consider the evidence and apply the *Hudson* factors.  We first consider the need for Officer Thorman to apply the spit hood and the relationship between his need and the amount of force used.  Officer Thorman

adduces evidence Mr. Fennell resisted orders on February 15.  He argues he needed to apply the spit hood to respond to Mr. Fennell's behavior.  Mr. Fennell responds Officer Thorman did not need to apply the spit hood because Officer Thorman does not adduce evidence Mr. Fennell spat at any officer or presented a physical threat.  Mr. Fennell also questions how Officer Thorman could assess the "need" to apply the spit hood when he was not trained and had not read the spit hood's instructions.[197]  We then consider the extent of any injury inflicted.  Officer Thorman adduces evidence the Prison's medical unit did not diagnose Mr. Fennell with any injury after this incident.  Mr. Fennell adduces evidence he could barely breath while wearing the spit hood.  We next consider the extent of the threat to the safety of staff and inmates, as reasonably perceived by prison officials.  Officer Thorman points to evidence he, and other officials, believed Mr. Fennell sought to start a riot in his housing unit on February 15.  Officer Thorman adduces evidence he and other prison officials were concerned for the safety of officials and other inmates.  Mr. Fennell challenges the officer's reasonable perceptions because he never suggested he would start a riot in his housing unit. Last, we look to the efforts made to temper the severity of a forceful response. Officer Thorman adduces evidence he used the spit hood as a last resort during a quickly evolving altercation with Mr. Fennell.  Mr. Fennell swears they placed the spit hood on him only after subduing him by pinning him to the ground.

There are disputed facts precluding summary judgment.  Weighing the *Hudson* factors, we cannot decide as a matter of law whether Officer Thorman's use of the spit hood was a "good-faith effort to maintain or restore discipline, or maliciously and sadistically" to cause harm.[198]  Mr. Fennell adduces evidence requiring a jury to apply the law after resolving disputed facts.[199]

### 2.   Mr. Fennell adduces facts to proceed to a jury on his retaliation claims against Lieutenant Rinker and Officer Waterman.

Mr. Fennell claims Lieutenant Rinker and Officer Waterman retaliated against him for filing lawsuits and grievances.  Lieutenant Rinker and Officer Waterman respond they did not know about Mr. Fennell's lawsuits or grievances.  And, in any event, they argue Mr. Fennell's claims are barred by the favorable termination rule.  We disagree with Lieutenant Rinker and Officer Waterman on this summary judgment record.

As with his retaliation claims described above, Mr. Fennell must adduce facts demonstrating genuine issues for the jury to decide whether: (1) he engaged in constitutionally protected conduct; (2) he suffered adverse action; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse response.[200]  "Because motivation is almost never subject to proof by direct evidence," Mr. Fennell may "rely on circumstantial evidence to prove a retaliatory motive."[201]  "He can satisfy his burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link."[202]  If Mr. Fennell makes a *prima facie* showing that his constitutionally protected conduct was a motivating factor in the decision to discipline, the defendant then has the burden of showing that the same disciplinary action would have been taken even in the absence of the protected activity.[203]

Mr. Fennell again meets the first two elements of a retaliation claim. He engaged in constitutionally protected conduct by filing a January 8, 2019 lawsuit and by telling Officer Waterman of his intent to file a grievance against him on February 8, 2019.  Mr. Fennell suffered an adverse action on February 15, 2019: Officer Waterman told Lieutenant Rinker that Mr. Fennell was planning to refuse a lock-in after recreation and, as a result, the two cited him for a misconduct,

directed he be removed from his cell, transferred to medical, and strip searched.  We must then determine if Mr. Fennell adduces evidence of causation.

Mr. Fennell adduces evidence supporting a causal relationship against Officer Waterman. Mr. Fennell adduces evidence he threatened Officer Waterman with a lawsuit on February 8, 2019. Mr. Fennell adduces evidence of the adverse action—a misconduct, a forceful removal from his cell, and transfer to medical—seven days later.   Mr. Fennell establishes a close temporal connection.  Officer Waterman argues a same decision defense—he took the actions he did to preserve safety and security of the Prison.  But Mr. Fennell adduces evidence he did not say these things to Officer Waterman. We must allow a jury to make this credibility determination.

Mr. Fennell also adduces evidence supporting a causal relationship against Lieutenant Rinker.  Mr. Fennell named Lieutenant Rinker in his January 8, 2019 lawsuit.  Lieutenant Rinker's counsel entered his appearance in the case on February 13, 2019.   Lieutenant Rinker learned Mr. Fennell threatened to include Officer Waterman in a lawsuit on February 8, 2019.  Mr. Fennell claims Lieutenant Rinker retaliated against him on February 15, 2019 by issuing a misconduct to Mr. Fennell.  Mr. Fennell adduces evidence of an unusually suggestive temporal activity between his protected acts and his adverse action to establish a prima facie case.  The burden shifts to Lieutenant Rinker to prove a same decision defense.  Lieutenant Rinker relies on a safety and security argument.  Lieutenant Rinker may ultimately prove successful on this same decision defense—he may argue he simply relied on what Officer Waterman told him to protect to safety and security of the jail.  But we cannot conclude there is clear and overt evidence Lieutenant Rinker credibly relied on Officer Waterman's statements before acting against Mr. Fennell.

We also cannot conclude the favorable termination rule bars Mr. Fennell's claims.   The favorable termination rule only bars civil lawsuits when the subject of the lawsuit seeks to overturn

a criminal conviction.[204]  Lieutenant Rinker and Officer Waterman fail to sensibly explain how Mr. Fennell seeks to overturn a criminal conviction.  We interpret his claims to be separate from any criminal proceeding.

### E.      We allow Mr. Fennell to pursue punitive damages subject to trial proof.

Mr. Fennell may proceed to trial on his remaining claims against Officer Colarusso, Lieutenant Rinker, and Officer Waterman.  Defendants move for summary judgment on Mr. Fennell's claim for punitive damages.  Mr. Fennell responds the question of punitive damages is better suited for decision at trial rather than on summary judgment. We agree with Mr. Fennell. We defer to trial.

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[205] "This standard is disjunctive: 'The defendant's conduct must be, a minimum, reckless or callous. . . . [T]he defendant's action need not necessarily [be intentional or motivated by evil motive].'"[206]  Mr. Fennell adduces sufficient factual matter that Officer Colarusso, Lieutenant Rinker, and Officer Waterman acted with reckless or callous indifference to Mr. Fennell's federally protected rights to proceed to a jury for punitive damages.  Mr. Fennell swears Officer Colarusso repeatedly referred to him as a "snitch" to other inmates, sprayed a mace gun into his cell, harassed him, and threatened his family. Mr. Fennell claims Lieutenant Rinker and Officer Waterman targeted him because he sued Lieutenant Rinker and threatened to sue Officer Waterman.  We allow the jury to determine liability and to consider all available remedies, including punitive damages, if it finds liability.

### III.    Conclusion

After the parties narrowed the claims following discovery, we partially grant Defendants'

motion for summary judgment.  We enter judgment in favor of Investigator Horvath, Lieutenant

Cruz, Officers Crowley and Nicholas.  Mr. Fennell adduces evidence to proceed to trial on his

excessive force and retaliation claim against Officer Colarusso, his excessive force claim against

Officer Thorman, and on his retaliation claims against Lieutenant Rinker and Officer Waterman.

---

[1] Mr. Fennell's counsel conceded the adduced evidence did not support the excessive force claims against Lieutenant Cruz, Lieutenant Rinker, and Officer Waterman, his retaliation claim against Officer Thorman, and each of his claims against Officers Crowley and Nicholas.   Officer Colarusso clarified he does not move for summary judgment on Mr. Fennell's excessive force claim because there are disputed facts which must be resolved by a jury.

[2] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. Defendants' SUMF ("Horvath SUMF") is docketed at ECF Doc. No. 43. Their appendix is docketed at ECF Doc. No. 43-1 through 43-28. References to the appendix are by Bates number, for example, "Appendix 1a."   Mr. Fennell's response to the Defendants' SUMF is docketed at ECF Doc. No. 53. Mr. Fennell also filed a counter SUMF ("Fennell SUMF") and supplements to the appendix ("Appendix 1287a–1430a"). *See* ECF Doc. No. 53.  Defendants responded to Mr. Fennell's counter SUMF. ECF Doc. No. 55.

[3] ECF Doc. No. 43 (Horvath SUMF) at ¶ 8; ECF Doc. No. 53 (Fennell Response) at ¶ 8.

[4] Appendix 1264a (ECF Doc. No. 43-26). The Northampton District Attorney appears to have withdrawn the drug delivery charge after a mistrial in April 2019. *Id.*

[5] ECF Doc. No. 43 (Horvath SUMF) at ¶ 2; ECF Doc. No. 53 (Fennell Response) at ¶ 2.  Mr. Fennell originally *pro se* sued for events occurring during his pre-trial detention also alleged here in *Fennell v. Horvath*, 18-4870 (E.D. Pa.) and *Fennell v. Northampton County*, No. 19-1972 (E.D. Pa.).  In *Fennell v. Horvath*, 18-4870, we referred the case to the Prisoner Civil Rights Panel. *Id.*, ECF Doc. No. 54.  We appointed John F. Murphy from Baker & Hostetler LLP to represent Mr. Fennell. *Id.*, ECF Doc. No. 56.  Mr. Fennell's counsel then stipulated to dismiss the *pro se* actions and filed Mr. Fennell's complaint before us today.  We appreciate the efforts of all counsel to assist *pro se* litigants consistent with our obligations as lawyers.  We further appreciate lead trial counsel's decision to allow the attorney most familiar with the record and briefing to present oral argument although they are not the most experienced attorney assigned to this representation.  Both counsel presented cogent and thoughtful argument demonstrating commitment to their clients and professional focus during our ongoing struggles with COVID-19 protocols.

---

[6] ECF Doc. No. 53 (Fennell SUMF) at ¶¶ 255–56; ECF Doc. No. 54 (Horvath Response) at ¶¶ 255–56.

[7] ECF Doc. No. 53 (Fennell SUMF) at ¶ 258; ECF Doc. No. 54 (Horvath Response) at ¶ 258.

[8] Appendix 261a (ECF Doc. No. 43-6).

[9] ECF Doc. No. 43 (Horvath SUMF) at ¶ 15; ECF Doc. No. 53 (Fennell Response) at ¶ 15.

[10] ECF Doc. No. 43 (Horvath SUMF) at ¶ 16; ECF Doc. No. 53 (Fennell Response) at ¶ 16.

[11] Appendix 277a (ECF Doc. No. 43-6). Investigator Horvath swears selling commissary is not a criminal offense, and he is not aware of any criminal charges based on selling commissary within the Northampton County Prison. *Id.* 290a.

[12] ECF Doc. No. 43 (Horvath SUMF) at ¶ 17; ECF Doc. No. 53 (Fennell Response) at ¶ 17.

[13] Appendix 278a–280a (ECF Doc No. 43-6).

[14] *Id.*

[15] Appendix 1156a (ECF Doc. No. 43-18).

[16] ECF Doc. No. 43 (Horvath SUMF) at ¶ 19; ECF Doc. No. 53 (Fennell Response) at ¶ 19.

[17] Appendix 277a (ECF Doc. No. 43-6).

[18] *Id.*

[19] ECF Doc. No. 53 (Fennell SUMF) at ¶ 258; ECF Doc. No. 54 (Horvath Response) at ¶ 258.

[20] ECF Doc. No. 43 (Horvath SUMF) at ¶ 29; ECF Doc. No. 53 (Fennell Response) at ¶ 29.

[21] ECF Doc. No. 43 (Horvath SUMF) at ¶ 30; ECF Doc. No. 53 (Fennell Response) at ¶ 30.

[22] ECF Doc. No. 43 (Horvath SUMF) at ¶ 32; ECF Doc. No. 53 (Fennell Response) at ¶ 32.

[23] ECF Doc. No. 43 (Horvath SUMF) at ¶ 23; ECF Doc. No. 53 (Fennell Response) at ¶ 23.

[24] Appendix 1156a (ECF Doc. No. 43-18).  Mr. Fennell denies selling food commissary.  Appendix 33a (ECF Doc. No. 43-3)

[25] Appendix 279a–80a (ECF Doc. No. 43-6).

[26] Appendix 1156a (ECF Doc. No. 43-18).

[27] *Id.*

[28] *Id.* 1157a.

[29] *Id.*

[30] *Id.*

[31] Appendix 1381a (ECF Doc. No. 53-1).

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.* Investigator Horvath's notes describe a different sequence of events on August 13, 2018: "I attempted again to ask [Mr.] Fennel [*sic*] about his relationship with [Mr.] Dittmar and he claimed he did not know what I was talking about. [Mr.] Fennel [*sic*] then claimed his heart hurt and he wanted to see the nurse before he returned to his cell. I immediately stopped the interview and led [Mr.] Fennel [*sic*] to Gate 4 where H Tier officers took custody of him." Appendix 1156a (ECF Doc. No. 43-18).

[38] Appendix 1157a (ECF Doc. No. 43-18); *see also* ECF Doc. No. 43 (Horvath SUMF) at ¶ 34; ECF Doc. No. 53 (Fennell Response) at ¶ 34.

[39] ECF Doc. No. 43 (Horvath SUMF) at ¶ 36; ECF Doc. No. 53 (Fennell Response) at ¶ 36.

[40] ECF Doc. No. 43 (Horvath SUMF) at ¶ 37; ECF Doc. No. 53 (Fennell Response) at ¶ 37.

[41] ECF Doc. No. 43 (Horvath SUMF) at ¶ 38; ECF Doc. No. 53 (Fennell Response) at ¶ 38.

[42] ECF Doc. No. 43 (Horvath SUMF) at ¶ 39; ECF Doc. No. 53 (Fennell Response) at ¶ 39.

[43] ECF Doc. No. 43 (Horvath SUMF) at ¶¶ 21, 27; ECF Doc. No. 53 (Fennell Response) at ¶¶ 21, 27.

[44] ECF Doc. No. 43 (Horvath SUMF) at ¶ 41; ECF Doc. No. 53 (Fennell Response) at ¶ 41.

[45] ECF Doc. No. 43 (Horvath SUMF) at ¶ 40; ECF Doc. No. 53 (Fennell Response) at ¶ 40.

---

[46] Mr. Fennell adduces facts largely through his own sworn affidavit relating to his interactions with Officer Colarusso; Officer Colarusso denies what Mr. Fennell swears to is the truth. *See* ECF Doc. No. 53 (Fennell SUMF) at ¶¶ 280–303; ECF Doc. No. 54 (Horvath Response) at ¶¶ 280–303.

[47] Appendix 1382a (ECF Doc. No. 53-1).

[48] *Id.* 1383a.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* 1384a.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Fennell v. Horvath*, No. 18-4870 (E.D. Pa.), ECF Doc. No. 2; *see also* ECF Doc. No. 53 (Fennell SUMF) at ¶ 311; ECF Doc. No. 54 (Horvath Response) at ¶ 311.

[73] *Fennell v. Horvath*, No. 18-4870 (E.D. Pa.), ECF Doc. No. 2.

[74] *Id.*

[75] ECF Doc. No. 53 (Fennell SUMF) at ¶ 309; ECF Doc. No. 54 (Horvath Response) at ¶ 309.

[76] ECF Doc. No. 53 (Fennell SUMF) at ¶ 310; ECF Doc. No. 54 (Horvath Response) at ¶ 310.

[77] Appendix 268a (ECF Doc. No. 43-6).

[78] ECF Doc. No. 53 (Fennell SUMF) at ¶¶ 316–317; ECF Doc. No. 54 (Horvath Response) at ¶ 316–317.

[79] ECF Doc. No. 53 (Fennell SUMF) at ¶¶ 316–317; ECF Doc. No. 54 (Horvath Response) at ¶¶ 316–317.

[80] ECF Doc. No. 53 (Fennell SUMF) at ¶¶ 317, 319; ECF Doc. No. 54 (Horvath Response) at ¶¶ 317, 319.

[81] Appendix 1385a (ECF Doc. No. 53-1).

[82] ECF Doc. No. 53 (Fennell SUMF) at ¶ 322; ECF Doc. No. 54 (Horvath Response) at ¶ 322.

[83] ECF Doc. No. 53 (Fennell SUMF) at ¶¶ 323, 325; ECF Doc. No. 54 (Horvath Response) at ¶¶ 323, 325.

[84] ECF Doc. No. 53 (Fennell SUMF) at ¶ 322; ECF Doc. No. 54 (Horvath Response) at ¶ 322.

[85] ECF Doc. No. 43 (Horvath SUMF) at ¶ 46; ECF Doc. No. 53 (Fennell Response) at ¶ 46.

[86] ECF Doc. No. 43 (Horvath SUMF) at ¶ 47; ECF Doc. No. 53 (Fennell Response) at ¶ 47.

[87] Appendix 1260a (ECF Doc. No. 43-25).

[88] Appendix 404a, 426a (ECF Doc. No. 43-8).

[89] *Id.* 404a.

[90] *Id.* 428a.

[91] *Id.* 403a; *see also* Appendix 1233a–1238a (ECF Doc. No. 43-23).

[92] ECF Doc. No. 43 (Horvath SUMF) at ¶ 59; ECF Doc. No. 53 (Fennell Response) at ¶ 59.

[93] ECF Doc. No. 43 (Horvath SUMF) at ¶ 61; ECF Doc. No. 53 (Fennell Response) at ¶ 61.

[94] ECF Doc. No. 43 (Horvath SUMF) at ¶ 62; ECF Doc. No. 53 (Fennell Response) at ¶ 62.

[95] Appendix 405a (ECF Doc. No. 43-8).

[96] ECF Doc. No. 43 (Horvath SUMF) at ¶¶ 64–65; ECF Doc. No. 53 (Fennell Response) at ¶¶ 64–65.

[97] ECF Doc. No. 43 (Horvath SUMF) at ¶ 65; ECF Doc. No. 53 (Fennell Response) at ¶ 65.

[98] ECF Doc. No. 43 (Horvath SUMF) at ¶¶ 66–67; ECF Doc. No. 53 (Fennell Response) at ¶¶ 66–67.

[99] ECF Doc. No. 43 (Horvath SUMF) at ¶ 70; ECF Doc. No. 53 (Fennell Response) at ¶ 70.

[100] ECF Doc. No. 43 (Horvath SUMF) at ¶ 71; ECF Doc. No. 53 (Fennell Response) at ¶ 71.

[101] Appendix 411a (ECF Doc. No. 43-8).

[102] *Id.* 428a.

[103] ECF Doc. No. 43 (Horvath SUMF) at ¶ 88; ECF Doc. No. 53 (Fennell Response) at ¶ 88.

[104] *Fennell v. Penchishen¸* No. 19-111 (E.D. Pa.), ECF Doc. No. 2.

[105] *Id.*

[106] *Id.*, ECF Doc. No. 11.  We granted the Defendants' motion to dismiss and allowed Mr. Fennell leave to amend. *Id.*, ECF Doc. Nos. 66, 67. When Mr. Fennell did not file an amended complaint, we dismissed and closed the case. *Id.*, ECF Doc. No. 70.

[107] Appendix 1248a (ECF Doc. No. 43-25).

[108] Appendix 467a (ECF Doc. No. 43-9).

[109] Appendix 790a (ECF Doc. No. 43-14).

---

[110] *Id.* 795a.

[111] ECF Doc. No. 53 (Fennell SUMF) at ¶ 337; ECF Doc. No. 55 (Horvath Response) at ¶ 337.

[112] ECF Doc. No. 43 (Horvath SUMF) at ¶¶ 88; ECF Doc. No. 53 (Fennell Response) at ¶¶ 88.

[113] ECF Doc. No. 43 (Horvath SUMF) at ¶¶ 83–84; ECF Doc. No. 53 (Fennell Response) at ¶¶ 83–84.

[114] Appendix 804a (ECF Doc. No. 43-14).

[115] ECF Doc. No. 43 (Horvath SUMF) at ¶ 86; ECF Doc. No. 53 (Fennell Response) at ¶ 86.

[116] Appendix 1385a (ECF Doc. No. 53-1).

[117] ECF Doc. No. 43 (Horvath SUMF) at ¶ 89; ECF Doc. No. 53 (Fennell Response) at ¶ 89.

[118] ECF Doc. No. 43 (Horvath SUMF) at ¶ 90; ECF Doc. No. 53 (Fennell Response) at ¶ 90.

[119] ECF Doc. No. 43 (Horvath SUMF) at ¶ 91; ECF Doc. No. 53 (Fennell Response) at ¶ 91.

[120] ECF Doc. No. 43 (Horvell SUMF) at ¶ 93; ECF Doc. No. 53 (Fennell Response) at ¶ 93.

[121] ECF Doc. No. 43 (Horvath SUMF) at ¶ 94; ECF Doc. No. 53 (Fennell Response) at ¶ 94.

[122] ECF Doc. No. 43 (Horvath SUMF) at ¶ 96; ECF Doc. No. 53 (Fennell Response) at ¶ 96.

[123] ECF Doc. No. 43 (Horvath SUMF) at ¶ 97; ECF Doc. No. 53 (Fennell Response) at ¶ 97.

[124] ECF Doc. No. 43 (Horvath SUMF) at ¶ 98; ECF Doc. No. 53 (Fennell Response) at ¶ 98.

[125] ECF Doc. No. 43 (Horvath SUMF) at ¶ 99; ECF Doc. No. 53 (Fennell Response) at ¶ 99.

[126] ECF Doc. No. 43 (Horvath SUMF) at ¶ 100; ECF Doc. No. 53 (Fennell Response) at ¶ 100.

[127] ECF Doc. No. 43 (Horvath SUMF) at ¶ 101; ECF Doc. No. 53 (Fennell Response) at ¶ 101.

[128] ECF Doc. No. 43 (Horvath SUMF) at ¶ 102; ECF Doc. No. 53 (Fennell Response) at ¶ 102.

[129] ECF Doc. No. 43 (Horvath SUMF) at ¶ 103; ECF Doc. No. 53 (Fennell Response) at ¶ 103.

[130] ECF Doc. No. 43 (Horvath SUMF) at ¶ 104; ECF Doc. No. 53 (Fennell Response) at ¶ 104.

[131] ECF Doc. No. 43 (Horvath SUMF) at ¶ 105; ECF Doc. No. 53 (Fennell Response) at ¶ 105.

[132] ECF Doc. No. 43 (Horvath SUMF) at ¶ 106; ECF Doc. No. 53 (Fennell Response) at ¶ 106.

[133] ECF Doc. No. 43 (Horvath SUMF) at ¶ 107; ECF Doc. No. 53 (Fennell Response) at ¶ 107.

[134] ECF Doc. No. 43 (Horvath SUMF) at ¶ 108; ECF Doc. No. 53 (Fennell Response) at ¶ 108.

[135] ECF Doc. No. 53 (Fennell SUMF) at ¶ 354; ECF Doc. No. 54 (Horvath Response) at ¶ 354.

[136] Appendix 721a–722a.

[137] *Id.* 722a.

[138] Appendix 648a (ECF Doc. No. 43-12).

[139] Appendix 59a (ECF Doc. No. 43-3).

[140] ECF Doc. No. 43 (Horvath SUMF) at ¶ 110; ECF Doc. No. 53 (Fennell Response) at ¶ 110.

[141] ECF Doc. No. 43 (Horvath SUMF) at ¶ 113; ECF Doc. No. 53 (Fennell Response) at ¶ 113.

[142] ECF Doc. No. 43 (Horvath SUMF) at ¶ 114; ECF Doc. No. 53 (Fennell Response) at ¶ 114.

[143] ECF Doc. No. 43 (Horvath SUMF) at ¶ 115–116; ECF Doc. No. 53 (Fennell Response) at ¶ 115–116.

[144] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson,* 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris,* 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg,* 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis,* 808 F.3d at 643 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis,* 808 F.3d at 643 (citing *Celotex Corp.,* 477 U.S. at 322-323).

[145] U.S. Const. amend. V.

[146] 384 U.S. 436 (1966).

[147] *Id.* at 444.

[148] *Giuffre v. Bissell,* 31 F.3d 1241, 1256 (3d Cir. 1994).

[149] *Id.*

[150] *See Renda v. King,* 347 F.3d 550, 557-58 (3d Cir. 2003); *see also James v. York County Police Dep't,* 160 F. App'x 126, 133 (3d Cir. 2005).

[151] *Giuffre,* 31 F.3d at 1256; *see also James,* 160 F. App'x at 133.

[152] During oral argument, Mr. Fennell's counsel argued it is a jury question whether Mr. Fennell's statements were used against him at trial.   But he did not point to a specific statement at trial.   We cannot infer the prosecutor's knowledge of these statements which the prosecutor did not use. Absent use of these statements against him, we cannot infer a constitutional violation.   Without adducing evidence of a statement used at trial, there is no question of fact for our jury.

[153] U.S. Const. amend. VI.

[154] *Kirby v. Illinois*, 406 U.S. 682, 688 (1971).

[155] *Id.* at 688–89.

[156] *Texas v. Cobb*, 532 U.S. 162, 168 (2001); *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).

[157] 378 U.S. 478 (1964).

[158] *Id.* at 484-85 (citations and quotations omitted).

[159] *Id.* at 485.

[160] *Kirby*, 406 U.S. at 690.

[161] *Feliciano v. Dohman*, 645 F. App'x 153, 155–56 (3d Cir. 2016) (citing *Carter v. McGrady,* 292 F.3d 152, 157–58 (3d Cir. 2002); *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir. 2001)).

[162] *Id.* (citing *Rauser,* 241 F.3d at 334).

[163] During oral argument, Mr. Fennell also cited to threats he swears Investigator Horvath made during the interview as the basis for retaliation.   A threat "is insufficient to constitute retaliation." *Cash v. Dohman*, No. 12-05268, 2018 WL 1531681, at *2 (E.D. Pa. Mar. 29, 2018) (citing *Gray v. City of Philadelphia*, 205 Fed.Appx. 931 (3d Cir. 2006)).   We reject this theory of retaliation based on an unsubstantiated threat with no support Investigator Horvath carried out any of the alleged threats.

[164] *Watson*, 834 F.3d at 425.

[165] *Id.* (citing *Carter v. McGrady*, 292 F.3d 152 (3d Cir. 2002)).

[166] *Id.* (citing *Carter*, 292 F.3d at 159).

[167] *Id.* (quoting *Carter*, 292 F.3d at 159).

[168] *Id.* (quoting *Carter*, 292 F.3d at 159).

[169] *Id.* at 426.

[170] *Id.*

[171] *Id.*

[172] *Id.* (citing *Carter,* 292 F.3d at 157–58; *Rauser,* 241 F.3d at 333).

[173] *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).

[174] *Id.*

[175] *Feliciano*, 645 F. App'x at 155–56 (citing *Rauser,* 241 F.3d at 334).

[176] Officer Colarusso argues Mr. Fennell fails to adduce facts showing his knowledge of the September 4, 2019 grievance.  But we do not read the law to require Mr. Fennell to prove "actual knowledge" to adduce facts supporting a prima facie case of retaliation.  *See Watson*, 834 F.3d at 422 (explaining test for prima facie claim of retaliation).

[177] *Feliciano*, 645 F. App'x at 155–56 (citing *Carter,* 292 F.3d at 157–58; *Rauser,* 241 F.3d at 333).

[178] *Watson*, 834 F.3d at 422.

[179] *Id.*

[180] *Feliciano*, 645 F. App'x at 155–56 (citing *See Rauser,* 241 F.3d at 334).

[181] *Watson*, 834 F.3d at 423.

[182] *See, e.g.*, *Hill v. Barnacle*, 655 F. App'x 142, 146 (3d Cir. 2016).

[183] *Walker v. Regan*, No. 13-7556, 2019 WL 1003155, at *7 (E.D. Pa. Feb. 27, 2019).

[184] *Wharton v. Danberg*, 854 F3d 234, 247 (3d Cir. 2017) (citing *Bell v. Wolfish*, 441, U.S. 520, 551 (1979) ("Our precedent is clear that while the detention of sentenced inmates is governed by the Eighth Amendment, the treatment of pretrial detainees is governed by the Due Process Clause")).

[185] *Kingsley v. Hendrick,* 135 S. Ct. 2466, 2473 (2015) (citations omitted).

[186] *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).

[187] *Id.; see also Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000).

[188] *See, e.g.*, *Hardwick v. Packer*, No. 12-1936, 2013 WL 4016495, at *13 (M.D. Pa. Aug. 6, 2013), *aff'd,* 546 F. App'x 73 (3d Cir. 2013).

[189] *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1177, 1178 (2010) (per curiam) (rejecting Fourth Circuit's requirement of "a showing of significant injury in order to state an excessive force claim," and reiterating "Hudson's direction to decide excessive force claims based on the nature of the force rather than the extent of the injury").

[190] *Hudson*, 503 U.S. at 9.

[191] *Smith v. Mensinger*, 293 18 F.3d 641, 648–49 (3d Cir. 2002).

[192] *Brooks*, 204 F.3d at 104.

[193] *Id.* at 108.

[194] *Robinson v. Southers*, No. 13-1603, 2020 U.S. Dist. LEXIS 59268 (M.D. Pa. Apr. 2, 2020).

[195] *Id.* at *32 (quoting *Kelley v. Herrera*, No. 16-1894, 2018 WL 3476442, at *7 (E.D. Cal. July 17, 2018), *report and recommendation adopted*, No. 16-1894, 2018 WL 9651052 (E.D. Cal. Oct. 24, 2018) *aff'd*, 785 F. App'x 502 (9th Cir. 2019)). Judge Carlson also applied the *Hudson* factors and concluded there could be no grounds for excessive force based on the presented record. *Id.* at *32–38.

[196] *Royster v. Beard*, No. 09-1150, 2011 WL 1085973, at *7 (W.D. Pa. Feb. 28, 2011), *report and recommendation adopted*, No. 09-1150, 2011 WL 1004662 (W.D. Pa. Mar. 21, 2011).

[197] Officer Thorman argues this theory is really a form of municipal liability, i.e., failure to train, which Mr. Fennell must assert against a municipal entity. We agree to the extent Mr. Fennell asserts liability solely on this basis. But the basis of Mr. Fennell's claim is excessive force, which we evaluate under the *Hudson* factors. The *Hudson* factors require we look to the need of applying certain force when considering whether force is malicious and sadistic. *Hudson*, 503 U.S. at 6–7. To consider whether force is malicious and sadistic, we consider "subjective" elements, including the facts and circumstances at the time, the officer's training and experience, and the officer's understanding about the particular force. *Ferrara v. Delaware Cty.*, No. 18-5157, 2019 WL 2568117, at *3 (E.D. Pa. June 21, 2019). Mr. Fennell adduces this evidence as probative of Officer Thorman's subjective belief for the need of applying this particular force in February 2019.

[198] *Hudson*, 503 U.S. at 6–7.

[199] We also cannot conclude the favorable termination rule bars Mr. Fennell's excessive force claim. The favorable termination rule only bars civil lawsuits when the subject of the lawsuit

seeks to overturn a criminal conviction. *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). Officer Thorman does not specifically address how Mr. Fennell's excessive force claim based on having a spit hood placed on him would challenge his criminal conviction.

[200] *Feliciano*, 645 F. App'x at 155–56 (citing *Carter,* 292 F.3d at 157–58; *Rauser v. Horn,* 241 F.3d at 333).

[201] *Watson*, 834 F.3d at 422.

[202] *Id.*

[203] *Feliciano*, 645 F. App'x at 155–56 (citing *Rauser,* 241 F.3d at 334).

[204] *Heck*, 512 U.S. at 486–87.

[205] *Smith v. Wade*, 461 U.S. 30, 56 (1983).

[206] *Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006) (quoting *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989)).